# In the District Court of the United States
## For the District of South Carolina
### CHARLESTON DIVISION

| | | |
|---|---|---|
| DORIS S. GRANT, | ) | Civil Action No. 2:06-3242-CWH-GCK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| CITY OF NORTH CHARLESTON | ) | **OF THE MAGISTRATE JUDGE** |
| HOUSING AUTHORITY and the | ) | |
| BOARD OF COMMISSIONERS | ) | |
| OF THE HOUSING AUTHORITY | ) | |
| OF THE CITY OF NORTH | ) | |
| CHARLESTON, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## I.    INTRODUCTION

The plaintiff, Doris S. Grant ("Plaintiff" or "Grant"), filed this action against the City of North Charleston Housing Authority and the Board of Commissioners of the Housing Authority of the City of North Charleston (collectively, the "Defendants"), alleging race discrimination, wrongful termination, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et. seq.*, and age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634.  Plaintiff requests a jury trial, and seeks the award of compensatory damages, lost wages and benefits, punitive damages, attorneys' fees, prejudgment interest on all claims, and injunctive relief.

This Court has original jurisdiction of this matter pursuant to 28 U.S.C. § 1331.  Venue is proper because the events at issue occurred in this District and Division.  28 U.S.C. § 1391.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), and Local Rule 73.02(B)(2)(g), D.S.C., this magistrate judge is authorized to review all pretrial matters in cases filed under 42 U.S.C. §

2000e, *et seq.*, and submit findings and recommendations to the District Court.  The Defendants have filed a motion for summary judgment.  As this is a dispositive motion, the Report is filed for review by the District Court.

## II.  FACTS

### A.  Plaintiff's Employment

The relevant facts are considered and discussed in the light most favorable to the Plaintiff, the party opposing summary judgment.  *Pittman v. Nelms*, 87 F.3d 116, 118 (4th Cir. 1996).

Plaintiff began working for the City of North Charleston Housing Authority ("Housing Authority") in October of 1984.  (Pl.'s Dep. 15:12-14, Sept. 20, 2006; Pl.'s Dep. 49:24-50:1, June 21, 2007).[1]  During the course of her employment with the Housing Authority, Plaintiff held several positions, including acting as the Housing Authority's Director of Housing Management and Department Head in Charge from October 1998 until May 2000.  (Ex. A and Ex. B to Defs.' Mem. Supp. Summ. J.; Pl.'s Dep. 92:19-22, June 21, 2007).  In that position, Plaintiff was responsible for the day-to-day operations of the Housing Authority during the time that the Housing Authority did not have an Executive Director.  (Ex. A to Defs.' Mem. Supp. Summ. J.).

In May 2000, Plaintiff was promoted to the position of Director of Housing Management

---

[1]     Plaintiff has been deposed twice.  Plaintiff's first deposition was taken on September 20, 2006, in connection with a case captioned *Jaudon v. Executive Director*, No. 2:05-3050, 2007 WL 1239248 (D.S.C. April 27, 2007).  A copy of that deposition transcript is attached to Defendants' motion for summary judgment as Exhibit 5.

Plaintiff's second deposition was taken on June 21, 2007, in connection with the present action.  A copy of that deposition transcript is attached to Defendants' motion for summary judgment as Exhibit 6.

and George Saldana ("Saldana") was hired as the Executive Director of the Housing Authority.

(Saldana Dep. 13:17-19).[2]  When Saldana was away from the office, Plaintiff would be put in

charge of the Housing Authority.  (Pl.'s Dep. 97:3–101: 22, June 21, 2007).  In March 2004,

Plaintiff was named Director of Housing Management and Director of Assisted Housing

Programs, a position she held until she was terminated on July 7, 2005.  (Defs.' Ex. A).

## B.  Walter Jaudon's Employment

The events leading to the present action are related to two claims of age discrimination

filed pursuant to the ADEA by Walter E. Jaudon, Jr. ("Jaudon"), against his former employer,

the Housing Authority.[3]  The facts of Jaudon's case, as set forth by the Magistrate Judge in a

Report and Recommendation, and as adopted by the District Court, are as follows:

> [Jaudon] was 53 years old when he filed his complaint.  He was hired by the defendant City of
> North Charleston Housing Authority as an independent contractor in October of 1993, as a Project
> Coordinator.  On February 20, 1998, [Jaudon] was hired by the Housing Authority as an employee
> as a Resident Initiatives Coordinator ("RIC").  His direct supervisor was the Executive Director for
> the Housing Authority, George Saldana.  [Jaudon] testified during his deposition that Saldana told
> [Jaudon] during the "HOPE VI application process" prior to November 2001, that the programs
> that [Jaudon] was responsible for as the RIC would be taken over by the CSS Coordinator
> position.  [Jaudon] remained employed by Defendant until July 16, 2004, when his position was
> eliminated.
>
> On May 17, 2002, a co-worker brought to [Jaudon's] attention the Housing Authority's
> advertisement for the CSS Coordinator position in the newspaper.  [Jaudon] applied for the job,
> which would have been a promotion, and submitted his resume on May 21, 2002.  The next day
> [Jaudon] learned that another person, Anthony Bostic, had been selected for the CSS Coordinator
> position.  [Jaudon] believes that he was more qualified for the job than Bostic and that his
> supervisor Saldana was well aware that he was more qualified than Bostic.
>
> On May 21, 2003, [Jaudon] filed a complaint with the South Carolina Human Affairs Commission
> (SCHAC) alleging age discrimination in his nonselection, almost one year after he knew someone
> else was selected to fill the CSS Coordinator position.  . . . . Although the charge also indicated
> that the latest date of discrimination was February 20, 2003, and that it was a "continuing action,"

---

[2]    A copy of Saldana's deposition transcript is attached to Defendants' motion for summary
judgment as Exhibit 7.

[3]    Plaintiff incorrectly states that Jaudon filed a Title VII race discrimination claim with the
EEOC.  (*See* Pl.'s Response 2, 30, 32, 33, 34, and 35).  Jaudon's EEOC claims alleged
age discrimination, retaliation and termination in violation of the ADEA.

[Jaudon] could not recall why that date was on the form.  (Internal citation omitted).  [Jaudon] stated that he knew he "only put one date."  (Internal citation omitted).  Likewise, neither the ADEA charge, nor the complaint in this action allege any separate acts of discrimination after the May 2002 date and the record here does not show any separate acts of alleged discrimination after that date.

In June 2003 [Jaudon] was offered a promotion to the position of Home Ownership Program Coordinator at an annual salary of $40,000.  [Jaudon's] salary at that time was $30,000 per year.  However, he declined the job because he believed $50,000 per year had been allocated for the position.  Subsequently, on August 26, 2003, [Jaudon] was again offered the position, this time at a salary of $42,500 per year.  Again, [Jaudon] rejected the offer.

At the end of 2003, the primary client population for [Jaudon's] program had ceased to exist and the program in which his position was funded was eliminated by the Housing Authority.  In a letter dated July 13, 2004, [Jaudon] was notified that his position would be eliminated and that his employment was going to end as of July 16, 2004.  The letter stated that the Housing Authority was downsizing in certain areas due to programs significantly decreasing, and because although [Jaudon] was offered a comparable or better position, he had chosen to decline the offers.

On November 18, 2004, [Jaudon] filed another ADEA discrimination charge with the SCHAC in which he alleged that his position was eliminated and he was terminated in retaliation for his having filed the first SCHAC charge on May 21, 2003.

*Jaudon v. Executive Director*, No. 2:05-3050, 2007 WL 1239248, at *2-3 (D.S.C. April 27, 2007).  Jaudon's EEOC Charge Statement, dated October 19, 2004, listed Doris Grant as a witness.  (Pl.'s Ex. G, p. 6).

## C.  The E-Mails Between Plaintiff and Jaudon

On February 8, 2005, approximately six months after Jaudon was terminated by the Housing Authority and approximately three months after Jaudon filed his second discrimination charge with SCHAC, Jaudon sent an e-mail to Plaintiff's work e-mail address at the Housing Authority.  The e-mail was addressed only to Plaintiff and the subject line said:  "your boy need [sic] to get this one:

Sal need to get this one…………….

Management Lesson –

>(1) Not everyone who sh**s on you is your enemy.

>(2) Not everyone who gets you out of sh** is your friend.

>**(3) And when you're in deep sh\*\*, it's best to keep your mouth shut!**

Walter

(Defs.' Ex. C) (boldface and font size in original).

According to Plaintiff, "Sal" in the first line referred to George Saldana, the Executive

Director of the Housing Authority.  (Pl.'s Dep. 104: 23—105: 5, June 21, 2007).  Plaintiff

replied to Jaudon the next morning, on February 9, 2005, with the following e-mail:

**Subject:  Re:**  your boy need to get this one/No this one!!

*I think this would apply to him best:*

Finally after a fourth night, the turkey was proudly perched at the top of the tree.

He was promptly spotted by a farmer, who shot him out of the tree.

<u>Management Lesson</u> – **Bull Sh\*\* might get you to the top, but it won't keep**

**you there!!!**

**Doris**

(Defs.' Ex. C) (italics and boldface in original).

Plaintiff testified that she responded to Jaudon's e-mail because she was "venting":

> I was upset because that was the day that I found out that Mr. Saldana had told staff
> that–had told members of my staff that their positions were going to be eliminated, and he
> didn't share that with me. . . . . The last conversation we had we were in a staff meeting
> and he told us as department heads that he would–we spoke about layoffs, he didn't say
> what departments, and he would get back to us when the final decision was made.

(Pl.'s Dep. 109: 10-15; 21-25, June 21, 2007).

> . . . [Saldana] had shared with members of my staff that their positions were slated to be
> eliminated and he had previously told us, as department heads, that he would share that
> information with us when he made a decision.

> I was upset because he didn't share the information with me before he informed
> employees.

(Pl.'s Dep. 110: 22-25–111: 7-9, June 21, 2007).

At the time these e-mails were exchanged, Plaintiff was the department head over Section 8 and Public Housing.  (Pl.'s Dep. 110: 9-13, June 21, 2007).  She was one of approximately four department heads (Pl.'s Dep. 111: 24—112: 1, June 21, 2007) and supervised thirteen employees.  (Pl.'s Dep. 110: 18-20, June 21, 2007).  Plaintiff testified that as a department head, she was a member of management and was privy to sensitive information relating to the Housing Authority.  (Pl.'s Dep. 112: 2-9, June 21, 2007).  Plaintiff admitted that as a department head, Saldana had put her in a position of trust.  (Pl.'s Dep. 118: 2-4, June 21, 2007).

On February 22, 2005, Jaudon sent Plaintiff another e-mail at her work e-mail address: Subject:  "To Do List."

**Write memos that pertain to:**

**1. Staff layoff (conversation with them concerning Saldana).**

**2. Hickman situation**

**3. Hamilton situation**

**4. Also communicate any reservations you may have about the entire housing situation occurring now that make [sic] you feel uncomfortable.**

**A. Be sure to include names, dates, time and place.**

**B. Mail at lease [sic] two (2) copies to yourself CERTIFIED.**

**C. Once you receive the letters, secure them, UNOPENED!**

**Walter Jaudon**

**P.S.**

**I was told this morning HUD knows about the Hickman situation.**

**Mariiyn [sic] is also aware.**

**She would like to act on the situation.**

**I think Larry and Dudley are the hold up at this point.**

(Defs.' Ex. E).  Plaintiff testified that she did not pay any attention to the e-mail when she received it and she did not respond to it.  (Pl.'s Dep. 119: 16-19, June 21, 2007; Pl.'s Dep. 43: 5-23, Sept. 20, 2006).  Plaintiff swore that she did not talk with Jaudon about staff layoffs (Pl.'s Dep. 121:7-11—122: 6-15, June 21, 2007), the Hickman situation (Pl.'s Dep. 121: 24–123: 1-8, June 21, 2007), or the Hamilton situation.  (Pl. Dep. 123: 10-17, June 21, 2007).

In response to Jaudon's fourth item on the list, Plaintiff admitted that she communicated concerns regarding the discriminatory practices at the Housing Authority and how they made her uncomfortable.  (Pl.'s Dep. 123: 18-25; 134: 1-7, June 21, 2007).  Plaintiff testified that she discussed the Housing Authority's age discrimination practices with Jaudon while she was still employed, but after he was terminated.  (Pl.'s Dep. 71: 7-12, June 21, 2007). Plaintiff and Jaudon discussed his EEOC claims (retaliation, age discrimination, hostile work environment) and her feeling that employees were not free to perform their duties without fear of retaliation.  (Pl.'s Dep. 79: 7-15; Pl.'s June 2007 Dep at p. 134, l. 8-14).  Plaintiff testified she gave information to Jaudon to help him with his EEOC charge.  (Pl.'s Dep. 133: 20-25, June 21, 2007).  Plaintiff testified that she "may have" given Jaudon information relating to the Housing Authority after his employment ended and admitted she "may have had conversations about what I perceived to be discriminatory practices there.  Conversations about violations of policies and procedures." (Pl.'s Dep. 56: 7-16, June 21, 2007).  Specifically, Plaintiff recalls one incident which she shared with Jaudon and which she thought was discriminatory:  Plaintiff recalled telling Jaudon about an employee (Joe Green) who was told he was going to be laid off, but that he would be able to find another job easily because he was young.  (Pl.'s Dep. 56: 13-25; 73: 20—74: 4, June 21, 2007).  Green was in his twenties.  (Pl.'s Dep. 56: 24-25, June 21, 2007).  Plaintiff testified that

she never told anyone at the Housing Authority that she had told Jaudon about the incident

involving Green.  (Pl.'s Dep. 157: 20-23, June 21, 2007).  Moreover, Plaintiff testified that she

doubted that Saldana knew about her conversation with Jaudon.  (Pl.'s Dep. 153: 20-23, June 21,

2007).  Furthermore, Jaudon testified that Plaintiff did not give him any information relating to

Joe Green until after Plaintiff was terminated on July 7, 2005.  (Jaudon Dep. 58: 15-17).[4]

Plaintiff also testified that after Jaudon's employment was terminated, she talked with him about

certain discriminatory practices based on race, how certain employees of the Housing Authority

and tenants and were allowed to violate policies and procedures, and how some tenants were

given special consideration.  (Pl.'s Dep. 56: 7-9; 20-23; 57: 6-13; 58: 1-15, June 21, 2007).

### D.  Plaintiff's Termination

Plaintiff testified as to what occurred on the morning of her termination on July 7, 2005:

[Grant]: Mr. Saldana came into my office, he gave me two e-mails–well, actually, he dropped the e-mails on my desk and he said:  Explain this.  Explain this.

This e-mail, the memo from Walter was the top e-mail.  And I was just taken aback that he had copies of e-mails.  I did not realize that he scrutinized e-mails.  Everyone in the office uses the e-mails for personal use, including him, so I didn't know he was scrutinizing e-mails.

And I made the comment:  You reading my e-mails.  And he said:  That's not the issue, I need you to explain these e-mails.  So I took a minute and I began to look over them.  And these situations happened in February and now it's July, I'm wondering why it's just coming to my attention.  And I began by answering–then I got–as I said earlier, this e-mail was on the top (Indicating).  And my interpretation as to why Walter sent me this e-mail was to engage is some activities to protect myself against reprisal.

So I began by making the comment:  You're not always trusted.  And he threw the e-mails.  Well, he got up and said–you know, in a hostile manner:  Well, if you feel that way, I want your resignation at the end of the day.  And walked out.  And at that point I'm sitting back–it's like, he never even allowed me to finish my sentence.  When I said the word: Trusted, he immediately got up and left the office.

Q:     So what were the words that you did get out before he left?

_____

[4]     A copy of Jaudon's deposition transcript is attached to Defendants' motion for summary judgment as Exhibit 8.

> [Grant]: You're not always trusted.
>
> Q:       Okay. And what was the sentence that you were trying to say?
>
> [Grant]: You're not always trusted to do the things you say you are going to do.

(Pl.'s Dep. 158: 1-25—159: 1-12, June 21, 2007).

Later that day, Saldana prepared a memorandum addressed to Plaintiff's personnel file

which stated:

> I met with Ms. Grant this morning to find out about the attached e-mails that she received from Mr. Jaudon regarding personnel and other matters of the Authority. She wanted to know how I got the e-mails. I told her that is not the issues [*sic*], again I stated, I want to know about these e-mails. She started to explain by saying that she "didn't trust" me. At that point I was so upset I didn't want to hear anything else she had to say. I told her I wanted her resignation by the end of the day or I will terminate her.

(Defs.' Ex. G).

At around 3:00 p.m. on the afternoon of July 7, Plaintiff submitted a memo to Saldana

which stated in part:

> It may have been poor judgment on my behalf to have made that type exchange using the system and I understand that the agency internet system is not private; however, I have not violated any agency policies; therefore I will not offer my resignation.

(Defs.' Ex. H; Pl. Dep. 172-173, June 21, 2007).

At around 5:00 p.m. on July 7, Saldana went into Plaintiff's office with a memorandum

notifying her that her employment was being terminated. (Defs.' Ex. F at 7-8; Pl.'s Dep. 174:

12-25—175: 1-23). Saldana's memorandum stated:

> [First sentence crossed out]. In particular, I asked for your explanation for your personal discussion of Housing Authority business, including personnel matters, with unauthorized third parties [end of sentence crossed out]. You responded by suggesting that I had improperly obtained the email correspondence and then stated that you could not trust me at which point I asked for your resignation. This afternoon you wrote an additional letter in response, which acknowledged that the Housing Authority's internet system is not private, and acknowledged your use of poor judgment but which stated that that [sic] you had not violated any agency policies and therefore would not offer your resignation. You have not provided any further explanation for your actions.
>
> Your position as my second in command at the Housing Authority is of the utmost confidential nature, dealing with issues of client information, personnel, and otherwise, and it is absolutely

> imperative that there be mutual trust and confidence between the two of us.  Your statement this morning has made it apparent that the requisite level of trust and confidence does not and cannot now exist.  I therefore gave you the option of resigning your position by the end of the day.  You have declined to resign.  Please be advised that pursuant to the "at-will" employment policy of the North Charleston Housing Authority, I hereby terminate your employment effective July 7, 2005 at 5:00 p.m. for the best interest of the Housing Authority.

(Defs.' Ex. F at 7).

Plaintiff testified that after Saldana handed her the Memorandum, he told her that he was hurt because of the e-mails, although he did not say why.  (Pl.'s Dep. 179: 14—180: 3, June 21, 2007).  Plaintiff stated that while Saldana was in her office, he crossed through two of the sentences in the memorandum after Plaintiff contested them.  (Pl.'s Dep. 194: 13—196: 12, June 21, 2007).

According to Plaintiff, at some point during their conversation spanning several topics, "it became clear to me that in what we were–in the manner we were speaking, that there was something else other than the e-mails why he was terminating me.  And I just didn't know what it was so I asked him:  What's the real reason you're terminating me?  And the real reason, he said:  Because I was helping Walter Jaudon . . . .He said that he believed I was helping Walter Jaudon  . . . in his charge . . . against the Housing Authority."  (Pl.'s Dep. 180: 9-24, June 21, 2007 *and* 181: 16-18, June 21, 2007).

Plaintiff testified that the e-mails exchanged between her and Jaudon led Saldana to believe that Plaintiff had "provided Mr. Jaudon with personnel information that he used in his claim against the housing authority."  (Defs.' Ex. F at 3; Pl.'s Dep. 180: 9—182: 3, June 21, 2007).  During Plaintiff's deposition taken in the *Jaudon* case on September 20, 2006, Plaintiff testified that she did not know what information Saldana assumed that she gave to Jaudon, or "what source [Saldana believed] it was used for."  (Pl.'s Dep. 71, 23-25, Sept.20,  2006).  During

her deposition taken in the present lawsuit, Plaintiff testified that Saldana never specifically said whether he was terminating her employment for helping Jaudon with his EEOC charge against the Housing Authority or whether he was referring to the HUD charge against the Housing Authority (Pl.'s Dep. 181: 11—182: 3, June 21, 2007), but she "assumed [Saldana] was talking about the EEOC charge. (Pl.'s Dep. 181: 19-22; June 21, 2007).

Saldana testified that his primary reason for terminating Plaintiff was that "we just lost trust for each other. Being an at-will employee, I didn't want to work with her anymore." (Saldana Dep. 59: 11-16). Saldana told the Charleston Post & Courier that he believed Plaintiff had given confidential information to Jaudon regarding a HUD investigation into the Housing Authority's alleged misuse of $2 Million of federal funds. (*See* Post & Courier Article, *Housing Official Fired Amid Probe*, July 18, 2005 (Defs.' Ex. I); *see also* Pl.'s Dep. 185: 25—186: 22, June 21, 2007).

In July, 2005, after her termination, Plaintiff admitted speaking with Nadine Parks, a reporter for the Post and Courier, who was writing an article about the Housing Authority. (Pl.'s Dep. 182: 8—187: 15, June 21, 2007). The article stated: "Grant . . . said she was terminated July 7 for breach of confidentiality." (Defs.' Ex. I). The article further stated:

> [Grant] said the authority was monitoring her e-mails and provided her with copies of correspondence between her and a former employee. In one of the e-mails, the former employee criticized management and advised Grant to cover herself with a paper trail, Grant said. Housing Authority Director George Saldana accused her of providing the former employee with confidential information and said he was hurt by her disloyalty, Grant said, but declined to go into more detail.

(Defs.' Ex. I).

**F.  Plaintiff's Grievance Hearing Before the Board of Commissioners**

On July 14, 2005, Plaintiff requested a grievance hearing, stating that it was her belief "that [her] termination pursuant to the 'at-will' employment policy of the North Charleston [H]ousing [A]uthority was used in retaliation after [she] could not be coerced to resign."  (Defs.' Ex. L).  On August 2, 2005, at Plaintiff's request, Jaudon prepared an affidavit addressed to the Board of Commissioners and Saldana, which stated:

> 1.)  Mrs. Doris Grant was not aware, did not participate, or contribute information pertaining to allegations sent to HUD Columbia Field office.
> . . .
> 3.)  Mrs. Doris Grant has not participated in any way with my EEOC charges. . . .
>
> 4.)  My relationship with a [sic] board of commissioner, staff members, public housing residents, and former employees remain amiable.  Information I wrote in the [February 22nd] email was conveyed to me as rumors, and I wrote those rumors as though they were "<u>factual</u>" in a personal email to Mrs. Grant.

(Defs.' Ex. K).

On or around August 3, 2005, Plaintiff submitted a "Statement of Complaint Regarding Termination" to the Board of Commissioners in support of her grievance.  (Pl.'s Ex. J; Defs.' Ex. F).  Plaintiff stated that she wished to clarify her statement to Saldana regarding "trust;" she explained that she could not count on Saldana to do the things he said he would do and gave specific examples of incidents in support of her argument.  (Pl.'s Ex. J; Defs.' Ex. F; Pl.'s Dep. 192: 1—194: 1-6, June 21, 2007).

On January 10, 2006, the Board of Commissioners held a special meeting at which it unanimously passed a motion "to uphold the actions of the Executive Director in the Doris Grant review."  (Defs.' Ex. L).  Plaintiff testified that she was represented by counsel during her grievance hearing, and that counsel had an opportunity to present her position to the Board.  (Pl.'s Dep. 198: 14-23, June 21, 2007).

## G. Plaintiff's Charge of Discrimination Filed with the EEOC

On April 5, 2006, Plaintiff filed a Charge of Discrimination with the EEOC, based solely

on retaliation pursuant to Title VII. Plaintiff's Charge of Discrimination stated in pertinent part:

II.     George S. Saldana, Executive Director, told me I was being terminated because he believed I provided a former employee with information used in his discrimination claim against the North Charleston Housing Authority.

III.    I believe I have been retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended because of my known association with a person who had filed a Charge of Discrimination with the EEOC and a private law suit.

(Pl.'s Ex. N; Defs.' Ex. M).

After investigating Plaintiff's claim, the EEOC issued a Dismissal and Notice of Rights

letter to Plaintiff on August 31, 2006, stating that "[b]ased upon its investigation, the EEOC is

unable to conclude that the information obtained establishes violations of the statutes." (Defs.'

Ex. N). This lawsuit followed.

## III.    PROCEDURAL HISTORY

On November 17, 2006, Plaintiff timely filed the present action alleging age

discrimination and retaliation. The Defendants answered the complaint on December 15, 2006,

denying the allegations and setting forth numerous defenses. Thereafter, the parties engaged in

discovery, except for discovery relating to the issue of damages. (Defs.' Mem. Supp. Summ. J.

1). The case was unsuccessfully mediated on August 10, 2007 before Willard D. Hanna, Jr.,

Esquire. On September 13, 2007, a motion for summary judgment was filed by the Defendants.

The Plaintiff filed her response on October 18, 2007, and Defendants filed their reply on

November 8, 2007. As the issues have been joined, this case is ripe for review.

## IV. SUMMARY JUDGMENT STANDARD

Courts take special care when considering summary judgment in employment

discrimination cases because states of mind and motives are often crucial issues. *Ballinger v.*

*North Carolina Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir.), *cert. denied*, 484 U.S.

897 (1987). This does not mean that summary judgment is never appropriate in these cases. To

the contrary, "the mere existence of some alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment; the requirement is that

there be no genuine issue of material fact." *Id., quoting Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly

speculative assertions will not suffice." *Ross v. Communications Satellite Corp.*, 759 F.2d 355,

364 (4th Cir. 1985).

      The facts and inferences to be drawn from the evidence must be viewed in the light most

favorable to the non-moving party. *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991). The

Defendants, as the moving parties, bear the initial burden of pointing to the absence of a genuine

issue of material fact. *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991),

*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the Defendants carry this burden,

"the burden then shifts to the non-moving party to come forward with facts sufficient to create a

triable issue of fact." *Id*. at 718-19, *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48

(1986). "[O]nce the moving party has met his burden, the nonmoving party must come forward

with some evidence beyond the mere allegations contained in the pleadings to show there is a

genuine issue for trial." *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874-75 (4th Cir. 1992). The

non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to

defeat a motion for summary judgment. *Id. and Doyle v. Sentry Inc.*, 877 F.Supp. 1002, 1005

(E.D.Va. 1995). Instead, the non-moving party is required to submit evidence of specific facts

by way of affidavits (*see* Fed.R.Civ.P. 56(e)), depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. *Baber, citing Celotex Corp., supra.* Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) *and DeLeon v. St. Joseph Hospital, Inc.*, 871 F.2d 1229, 1233 n. 7 (4th Cir. 1989). Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. *Evans v. Technologies Applications & Servs. Co.*, 80 F.3d 954 (4th Cir. 1996). In addition, a party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

## V.  DISCUSSION

### A.  The Defendants

Plaintiff's suit names as Defendants the Housing Authority and the Board of Commissioners of the Housing Authority of the City of North Charleston ("Board of Commissioners"). The question before this court is whether the Housing Authority is an arm of the State of South Carolina and therefore enjoys Eleventh Amendment immunity from Plaintiff's claims. The Eleventh Amendment prevents a federal court from entertaining a suit brought by a citizen against a State or against an instrumentality of the State that is considered an "arm of the State." *Regents of Univ. of Calif. v. Doe*, 519 U.S. 425, 430, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997). While some agencies exercising state power have been permitted to invoke the

Amendment in order to protect the state treasury from liability that would have had essentially the same practical consequences as a judgment against the State itself (*see, e.g., Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the Court has consistently refused to construe the Amendment to afford protection to political subdivisions such as counties and municipalities, even though such entities exercise a "slice of State power." *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979) (*citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).  However, state sovereign immunity under the Eleventh Amendment is not absolute, and no sovereign immunity defense is available where one of three exceptions applies:  (1) where a private party sues an appropriate state officer for prospective injunctive or declaratory relief from an ongoing violation of federal law, *see Ex parte Young*, 209 U.S. 123, 159-160, 28 S.Ct. 441, 52 L.Ed. 714 (1908); (2) where Congress, while acting pursuant to its powers under the Fourteenth Amendment, has properly abrogated a state's immunity, *see Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 59, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); or (3) where a state has waived its immunity by consenting to suit in federal court, *see College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999).

The court finds that the third exception applies in the present case.  The South Carolina Code authorizes each city in the State to create a "public body corporate and politic" to be known as a "Housing Authority."  *See* S.C. Code Ann. § 31-3-310.  The North Charleston Housing Authority is a political subdivision of the State of South Carolina, created in 1972, by action of the City of North Charleston, in accordance with the laws of the State of South

Carolina.  (Defs.' Answer ¶ 6).  By statute, a housing authority's general corporate powers permit it to sue and be sued in its corporate name.  S.C. Code § 31-3-440.  Thus, it appears that the Housing Authority is amenable to suit.

The Commissioners are appointed by a council of a municipality which created the Housing Authority (S.C. Code § 31-3-340), and the powers of each Housing Authority are vested in the commissioners holding office.  S.C. Code § 31-3-430.  Plaintiff has not filed any charges of discrimination against the Board of Commissioners in their individual capacities with the EEOC or the SCHAC relating to her claims in this case.  Therefore, it is recommended that the Board of Commissioners be dismissed from this action.

### B.  Plaintiff's Age Discrimination Claim

Plaintiff states in her Complaint that she was 49 years old at the time of her termination. and she alleges a cause of action for age discrimination under the ADEA.  (Compl. ¶ 7; *see also* Compl. p. 5).  As a threshold matter, it is recommended that Plaintiff's claim for age discrimination be dismissed for the following reasons:

First, Plaintiff failed to file an age discrimination claim with the EEOC or with SCHAC within 300 days of the alleged unlawful employment practice or conduct.  A party seeking redress in federal court for age discrimination under the ADEA first must pursue the administrative remedies available to her by making this filing.  *See Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000).  Although Plaintiff filed a Charge of Discrimination on April 5, 2006 alleging that she was retaliated against and terminated due to her association with Jaudon, she did not state anywhere in the Charge that those adverse acts were due to her age. (Defs.' Ex. M).  Thus, Plaintiff failed to pursue her administrative remedies with respect to her

age claim.

Second, Plaintiff admitted that she never filed a Charge of Discrimination alleging age discrimination.  (Pl.'s Dep. 200: 2-4, June 21, 2007).  Third, Plaintiff did not address the Defendants' argument in their motion for summary judgment regarding her first cause of action for age discrimination.  It appears to the undersigned that the Plaintiff has abandoned this claim, and it is recommended that this claim be dismissed as a matter of law.

### C.  Plaintiff's Race Discrimination Claim

Plaintiff identifies herself in the Complaint as an African American citizen.  (Compl. ¶ 7.) Paragraph 10 of Plaintiff's Complaint sets forth the only mention of discrimination based upon race.  Plaintiff does not subsequently argue that Plaintiff's race played any part in her termination.  It appears Plaintiff has abandoned her claim of race discrimination, and it is likewise recommended that this claim be dismissed as a matter of law.

### D.  Plaintiff's Section 1981 Claim

Plaintiff alleges a violation of 42 U.S.C. § 1981 in her Complaint, but does not state the basis for this claim.  (Compl. ¶ 1).  Plaintiff does not argue this claim to the court and appears to have abandoned her Section 1981 claim.  It is recommended that this claim be dismissed as a matter of law.

### E.  Plaintiff's Wrongful Termination and Retaliation Claims in violation of Title VII

Plaintiff alleges she was retaliated against in violation of Title VII when she was terminated.  (Compl. ¶ 10).

> Plaintiff asserts that the act of terminating the Plaintiff, discriminated against the Plaintiff because of her race and age and constituted retaliation by the Defendants against the Plaintiff, said retaliation prohibited by Title VII, Section[s] 703 and 704(a), et seq.  (Compl. ¶10.)

Plaintiff alleges in her Complaint that:

Plaintiff's termination was the result of Plaintiff assisting and/or the Executive Director believing that the Plaintiff was assisting Walter E. Jaudon with his Equal Employment Opportunity claim against the City of North Charleston Housing Authority, the Board of Commissioners of the North Charleston Housing Authority and its Executive Director, George Saldana, all in violation of the hereinabove-mentioned statutory edicts.  (Compl. ¶ 26).

Defendants have moved for summary judgment, claiming that Plaintiff's claims for retaliation are not cognizable under Title VII because her claim is based upon in her alleged assistance (or Saldana's alleged belief that she assisted) with one or both of Jaudon's EEOC charges of age discrimination, which had been brought pursuant to the ADEA.  (Defs.' Mem. Supp. Summ. J. 16; Defs.' Ex. P; Q).  Defendants argue that "Plaintiff's claim essentially sounds in age discrimination law."  (Defs.' Mem. Supp. Summ. J. 16).  At bottom, Defendants contend that Plaintiff should not have filed her action pursuant to Title VII, which does not provide a remedy for assisting someone with a claim of age discrimination, but should have filed her action pursuant to the ADEA, which specifically provides for a cause of action for an employer's retaliation against an employee who assists with a charge of age discrimination.  (Defs.' Mem. Supp. Summ. J. 16).  Defendants reason that because rights created by the ADEA must be enforced through the ADEA, Plaintiff's claim for wrongful retaliation on the grounds that she assisted with Jaudon's age claim should have been brought under the ADEA, and not under Title VII.

The ADEA prohibits employment discrimination against "any individual . . . because of such individual's age."  29 U.S.C. § 623(a).  The ADEA's anti-retaliation provision states:

It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, <u>testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter</u>.

29 U.S.C. § 623(d) (emphasis supplied by the undersigned).

Plaintiff did not bring her retaliation claim under the ADEA, but alleged retaliatory termination pursuant to Title VII. Title VII's anti-retaliation provision states:

> It shall be unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, <u>or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.</u>

42 U.S.C. 2000e-3(a) (emphasis supplied by the undersigned).

The statutory language of Title VII does not authorize retaliation claims in response to protected activity opposing age discrimination–it makes it unlawful only for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this <u>subchapter</u>" (42 U.S.C. § 2000e-3(a) (emphasis added)), meaning Title VII. Thus, the retaliation provision in Title VII applies only to those practices made unlawful employment practices by Title VII. Indeed, this conclusion is buttressed by the fact that Congress included explicit anti-retaliation language in many of the civil rights statutes. *See, e.g.,* National Labor Relations Act, 29 U.S.C. § 158(a)(4); Fair Labor Standards Act of 1938, 29 U.S.C. § 215(a)(3); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a); Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623(d); Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12203(a)-(b); Family and Medical Leave Act of 1993, 29 U.S.C. § 2615.

Each of the civil rights statutes provides the exclusive judicial remedy for claims falling within the scope of that particular statute. For example, in *Great American Federal Savings & Loan Association v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 2350-52, 60 L.Ed.2d 957 (1979), the Supreme Court held that § 1985(3) cannot be used to assert violations of Title VII because Title VII provides the exclusive remedy for the rights it creates. Following *Novotny*, the Fourth

Circuit held that the ADEA's comprehensive remedial scheme precluded individuals from

independently pursuing age discrimination claims outside the ADEA's remedial structure.

*Zombro v. Baltimore City Police Department*, 868 F.2d 1364, 1369 (4th Cir.), *cert. denied*, 493

U.S. 850, 110 S.Ct. 147, 107 L.Ed.2d 106 (1989).

      In *Zombro*, a plaintiff brought his age discrimination claim under § 1983 to enforce

substantive rights that were specifically addressed and protected by the ADEA.  In finding the

plaintiff's discriminatory transfer claim not justiciable under the Fourteenth Amendment, the

Fourth Circuit observed:

> An examination of the [ADEA] reveals that it is a precisely drawn, detailed statute, similar to other statutory schemes which have been held to provide the exclusive judicial remedy for a stated abuse.  <u>The conclusion is irresistible that the ADEA provides the exclusive judicial remedy for claims of age discrimination</u>.  *Platt v. Burroughs Corp.*, 424 F.Supp. 1329, 1340 (E.D.Pa. 1976).  A number of federal courts have similarly opined that substantive rights secured by the ADEA may not be used as the basis for a § 1983 suit.  *See, e.g., Paterson v. Weinberger*, 644 F.2d 521, 524 (5th Cir. 1981) (following the extension of the ADEA to federal employees, the ADEA became exclusive remedy for age discrimination in federal employment); *Ring v. Crisp County Hospital Authority*, 652 F.Supp. 477, 482 (M.D.Ga. 1987) ("ADEA is the exclusive remedy for claims of age discrimination, whether those claims are founded on the Constitution or on rights created by the ADEA.  It is the underlying conduct and not the rights asserted that determine the remedy."); *McCroan v. Bailey*, 543 F.Supp. 1201, 1209-10 (S.D.Ga. 1982) (rights created by ADEA cannot be enforced through § 1983); *Morgan v. Humboldt County School District*, 623 F.Supp. 440, 443 (D.Nev. 1985) (§ 1983 action preempted by ADEA where plaintiff's claim fails to allege facts showing a violation of some federally secured right other than those already protected by the ADEA); *Christie v. Marston*, 451 F.Supp. 1142, 1145 (N.D.Ill. 1978) ("Congress intended the ADEA to be the exclusive remedy for age discrimination in federal employment.").

*Zombro*, 868 F.2d at 1369.  Indeed, other circuits have held that the ADEA is the exclusive

judicial remedy for claims of age discrimination in employment.  *See, e.g., Tapia-Tapia v.*

*Potter*, 322 F.3d 742, 745 (1st Cir. 2003); *Purtill v. Harris*, 658 F.2d 134 (3d Cir. 1981); *Lafleur*

*v. Tex. Dep't of Health*, 126 F.3d 758, 760 (5th Cir. 1997); *Migneault v. Peck*, 158 F.3d 1131,

1140 (10th Cir. 1998), *rev'd on other grounds by*, 528 U.S. 1110 (2000); *Chennareddy v.*

*Bowsher*, 935 F.2d 315, 318 (D.C. Cir. 1991).

In *Waters v. Collins & Aikman Products Co.,* 208 F.Supp. 2d 593 (W.D.N.C. 2002) the court dismissed a plaintiff's age discrimination claims brought under Title VII, explaining:

> In asserting his claims for discrimination based on age and for retaliation based on opposing age and disability discrimination, plaintiff has attempted to invoke the protections of Title VII, which prohibits discrimination based on "race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). In this particular case, the only protections that plaintiff may assert are found in the ADEA and in the Americans with Disability Act ("ADA"), not Title VII. While courts adopt schemes of proof developed in Title VII, claims for substantive violations and retaliation for age and disability discrimination are found exclusively in the ADEA and ADA, respectively.

*Waters,* 208 F.Supp. 2d at 595 (emphasis supplied by the undersigned).

The Plaintiff should have filed her claim under the ADEA to the extent she claims she was retaliated against and terminated because she "testified, assisted, or participated in any manner in an investigation, proceeding, or litigation" regarding Jaudon's ADEA claims, or because Saldana believed she had done so. Plaintiff's claims are not cognizable under Title VII, and it is recommended that Defendants are entitled to judgment as a matter of law.

## RECOMMENDATION

For the foregoing reasons, it is recommended that the Defendants' motion for summary judgment [58] be granted.

GEORGE C. KOSKO
UNITED STATES MAGISTRATE JUDGE

August 21, 2008

Charleston, South Carolina